# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Elba Maria Vasquez Cruz, Ana Rodriguez, and Felicia Reyes, individually, and on behalf of all other similarly situated individuals, and the Proposed Minnesota Rule 23 Class,<br><br>Plaintiffs,<br><br>v.<br><br>TMI Hospitality, Inc.; TMI Employee Management, Inc.; and TMI Property Management, Inc.,<br><br>Defendants. | Case No. 14-cv-1128 (SRN/FLN)<br><br><br><br><br><br>**MEMORANDUM OPINION AND ORDER** |

J. Ashwin Madia and Joshua A. Newville, Madia Law LLC, 345 Union Plaza, 333 Washington Avenue North, Minneapolis, Minnesota 55401, for Plaintiffs.

Sara G. McGrane and Grant T. Collins, Felhaber Larson, 220 South Sixth Street, Suite 2200, Minneapolis, Minnesota 55402, for Defendants.

SUSAN RICHARD NELSON, United States District Judge

## I.      INTRODUCTION

This matter is before the Court on Defendants' Objections to the Magistrate Judge's

May 13, 2015 Order [Doc. No. 69] and Defendants' Motion for Summary Judgment [Doc.

No. 87].  For the reasons stated below, Defendants' Objections are overruled in part and

overruled as moot in part, and Defendants' Motion for Summary Judgment is granted in part and denied in part.[1]

## II.   BACKGROUND

### A.   The Parties and the Claims

This lawsuit arises from Plaintiffs' employment as housekeepers at the Fairfield Inn & Suites Bloomington (the "Fairfield"). (See First Am. Compl. [Doc. No. 67] ¶ 10.) There are three named plaintiffs who seek to represent a class of Fairfield housekeepers: Elba Maria Vasquez Cruz, Ana Rodriguez, and Felicia Reyes (the "Named Plaintiffs"). Defendants TMI Hospitality, Inc., TMI Employee Management, Inc., and TMI Property Management, Inc. develop and operate hotels, including the Fairfield. During the relevant time period, Marjorie Smith was the Fairfield's General Manager, Sonia Ochoa was the Executive Housekeeper, and Maira Torres and Gloria Gomez were Assistant Executive Housekeepers. (See Madia Decl. in Support of Pls.' Mot. for Rule 23 Class Cert. [Doc. No. 55][2] ("Madia Rule 23 Decl."), Ex. A (Smith Dep. 7:21-25, 17:25–18:5, 55:15–56:25), Ex. C (Rodriguez Dep. 21:11-12).) These individuals are not named as defendants in this lawsuit. All of Fairfield's housekeepers reported to Ms. Ochoa. (See Madia Rule 23 Decl., Ex. A (Smith Dep. 18:15–19:10, 21:10-19, 24:15–25:10).)

---

[1]   Also pending before the Court are Plaintiffs' Motion for Rule 23 Class Certification [Doc. No. 53] and Defendants' Motion to Decertify the Conditionally Certified Class [Doc. No. 60]. The Court will issue a separate Order on those Motions.

[2]   In briefing Defendants' Motion for Summary Judgment, the parties rely on several declarations and exhibits that were submitted in relation to previously-filed motions.

The Named Plaintiffs filed this lawsuit on April 15, 2014, asserting five causes of action against Defendants:  overtime, minimum wage, and recordkeeping violations under the Fair Labor Standards Act ("FLSA") (Count I), (see First Am. Compl. ¶¶ 62–69); minimum wage, gratuities, meal and rest break, and recordkeeping violations under the Minnesota Fair Labor Standards Act ("MFLSA") (Count II), (see id. ¶¶ 70–77); unlawful deduction violations under Minnesota Statutes § 181.79 (Count III), (see id. ¶¶ 78–82); breach of contract and conversion under Minnesota common law (Count IV), (see id. ¶¶ 83–94); and national origin discrimination under the Minnesota Human Rights Act ("MHRA") (Count V), (see id. ¶¶ 95–99).  Between April 29 and June 20, 2014, Marta Rodriguez a/k/a Yolanda Rocha, Maria Montano, Antonia Chepetla Cortes, and Juana Reyes filed consent forms to join this FLSA lawsuit.  (See Notices of Consent Filing [Doc. Nos. 6, 8, 10].) After notice was sent to additional potential class members, three more individuals joined the lawsuit:  Colleen Collins, Erica Cory, and Gloria Gomez.  (See Notices of Consent Filing [Doc. Nos. 32, 37, 38].)  These individuals may be referred to herein as "Opt-in Plaintiffs" or collectively as the "FLSA Plaintiffs."

## B.      Off-the-Clock Work

At the heart of this lawsuit are Plaintiffs' allegations that they were required to work off the clock and were not compensated for that time.  For example, Plaintiffs have testified that they were required to fold linens and prepare their cleaning carts prior to punching in for their shifts.  (See, e.g., Madia Rule 23 Decl., Ex. B (Cruz Dep. 162:21–163:11, 167:25–168:16, 191:24–192:2), Ex. C (Rodriguez Dep. 18:3-11), Ex. D (Reyes Dep. 29:24–30:2), Ex. F (Montano Dep. 71:5–72:7), Ex. G (Carrion Dep. 45:12–46:10).)  Plaintiffs have also

testified that they were frequently required to punch out at the end of their shifts and then to continue cleaning rooms.  (<u>See, e.g.</u>, Madia Rule 23 Decl., Ex. B (Cruz Dep. 61:8-18, 192:3-22), Ex. C (Rodriguez Dep. 18:22–19:11, 68:11-14, 91:13-15, 99:24–100:15), Ex. F (Montano Dep. 62:3-15).)  Once in awhile, according to Plaintiffs, they also were required to work entire shifts without punching in.  (<u>See, e.g.</u>, Madia Rule 23 Decl., Ex. B (Cruz Dep. 46:11–47:24), Ex. C (Rodriguez Dep. 48:20–49:19), Ex. F (Montano Dep. 22:11–24:4).)

At least six Plaintiffs (Cruz, Rodriguez, Felicia Reyes, Montano, Cortes, and Gomez) estimated that they worked off the clock, as described above, for at least three hours per week, and for as much as five to six-and-a-half hours per week.  (<u>See</u> Madia Rule 23 Decl., Ex. B (Cruz Dep. 169:12-16), Ex. C (Rodriguez Dep. 107:18-22), Ex. D (F. Reyes Dep. 85:24–86:5), Ex. F (Montano Dep. 94:3-6), Ex. L (Gomez Decl. ¶ 4); Collins Aff. in Supp. of Defs.' Mem. of Law Opposing Pls.' Mot. for Rule 23 Class Cert. [Doc. No. 59] ("Collins Rule 23 Opp. Aff."), Ex. D (Cortes Dep. 87:3-9).)  Opt-in Plaintiff Collins testified that she worked off the clock anywhere from one-and-a-half hours per week to four-and-a-half hours per week, depending upon whether she was working in the kitchen (where she worked fewer hours off the clock) or housekeeping (where she worked more hours off the clock).  (<u>See</u> Collins Rule 23 Opp. Aff., Ex. C (Collins Dep. 46:6-18).)  Similarly, Opt-in Plaintiff Juana Reyes testified that she worked between forty-five minutes and two hours and fifteen minutes off the clock in any given week.  (<u>See</u> Madia Rule 23 Decl., Ex. G (J. Reyes Dep. 43:21–44:11).)

4

### C.    Rest and Meal Breaks

Several housekeepers provided testimony regarding the rest and meal breaks that they took while working for Defendants.  As for rest breaks, Named Plaintiff Rodriguez testified that, although she was never told that she was not allowed to go to the bathroom, she was only able to take restroom breaks when she had time and not as needed.  (Madia Rule 23 Decl., Ex. C (Rodriguez Dep. 87:20–90:5).)  Named Plaintiff Cruz testified that, if she had to use the restroom, she had to "really quickly" use the bathroom in the guest room she was cleaning.  (Id., Ex. B (Cruz Dep. 187:18–188:3).)  Similarly, Opt-in Plaintiff Rocha said that, although she usually used the bathroom in the guest room that she was cleaning when she had to use the restroom, "[s]ometimes we were running so hard that we didn't even drink water so you didn't even feel like you had to go to the bathroom."  (Collins Aff. in Supp. of Defs.' Mot. for Summ. J. [Doc. No. 90] ("Collins SJ Aff."), Ex. 1 (Rocha Dep. 39:1-20).)  And, Opt-in Plaintiff Montano testified that "[Ms. Ochoa] would push me more and push me more and push me more and just give me this extreme amount of rooms."  (Madia Rule 23 Decl., Ex. F (Montano Dep. 29:9-11).)  Both Rocha and Montano testified that Ms. Ochoa would not give them a break.  (Collins SJ Aff., Ex. 1 (Rocha Dep. 41:24 42:4); Madia Rule 23 Decl., Ex. F (Montano Dep. 29:11).)

On the other hand, Named Plaintiff Felicia Reyes testified that she never had a problem using a restroom during the day because Ms. Ochoa and Ms. Torres told her that she could use the bathroom in the guest room she was cleaning.  (See Madia Rule 23 Decl., Ex. D (F. Reyes Dep. 71:16–73:3).)  Similarly, several housekeepers have submitted sworn declarations stating that they were never told that they could not take a restroom break and

that they did, in fact, use the restroom.  (See, e.g., Collins Rule 23 Opp. Aff., Ex. A, at 5 (Second Flores Decl. ¶ 9), 8 (Second Ibarra Decl. ¶ 11), 20 (Perez Decl. ¶ 3).)

As for meal breaks,[3] Opt-in Plaintiff Juana Reyes testified that she was always able to take a lunch break, but that the breaks were "as fast as possible and usually less than half an hour."  (Madia Rule 23 Decl., Ex. G (J. Reyes Dep. 30:25–31:6, 32:23–33:1).)  And, seven more housekeepers submitted sworn declarations stating that they were never told that they could not take a meal break and that they did, in fact, take meal breaks.  (See Collins Rule 23 Opp. Aff., Ex. A, at 5 (Second Flores Decl. ¶¶ 3, 8), 8 (Second Ibarra Decl. ¶ 10), 13 (Kabba Decl. ¶ 2), 20 (Perez Decl. ¶ 2); Curbelo Aff. [Doc. No. 23], at 2 (Ufredo Decl. ¶ 7), 6 (Martinez Decl. ¶ 7); Second Collins Aff. in Supp. of Defs.' Mem. of Law Opposing Pls.' Mot. for Rule 23 Class Cert. [Doc. No. 82] ("Second Collins Rule 23 Aff."), Ex. 1 (Capelez Decl. ¶ 9).)  However, those housekeepers also stated that they either often did not take a break to eat, took only a fifteen-to-thirty minute break, or ate in the room that they were cleaning.  (See Collins Rule 23 Opp. Aff., Ex. A, at 5 (Second Flores Decl. ¶ 3), 8 (Second Ibarra Decl. ¶ 10), 13 (Kabba Decl. ¶ 3), 20 (Perez Decl. ¶ 2); Curbelo Aff. at 6 (Martinez Decl. ¶ 7); Second Collins Rule 23 Aff., Ex. 1 (Capelez Decl. ¶ 9).)

### D.   Tips

Plaintiffs also claim that Defendants stole tip money left for them by hotel guests. According to Plaintiffs Cruz and Montano, if Ms. Ochoa checked the guest rooms before the housekeepers went into the rooms, then there either would be no tips or very minimal

---

[3]     As discussed below, Defendants dispute only a portion of the meal-break claims. See infra, Part III.B.2.c.  Accordingly, the Court summarizes only the testimony relevant

tips in the rooms.  (See Madia Rule 23 Decl., Ex. B (Cruz Dep. 94:24–95:16), Ex. F

(Montano Dep. 14:24–15:5, 19:11–20:21).)  Similarly, several Plaintiffs testified that, if Ms.

Ochoa had first gone through the rooms, then they would find thank-you notes from guests

crumpled by the garbage can and unaccompanied by tip money.  (See Madia Rule 23 Decl.,

Ex. B (Cruz Dep. 89:16-20), Ex. C (Rodriguez Dep. 122:9–123:18), Ex. D (F. Reyes Dep.

109:10–112:9), Ex. F (Montano Dep. 51:15–53:1).)  If Ms. Ochoa had not first gone into the

rooms, however, then Plaintiffs Cruz and Montano would receive a greater amount of tips.

(See Madia Rule 23 Decl., Ex. B (Cruz Dep. 94:24–95:16), Ex. F (Montano Dep. 14:24–

15:5, 49:8-18).)  In addition, although several housekeepers stated that they never saw

anyone take tips from their rooms, (see Madia Rule 23 Decl., Ex. G (J. Reyes Dep. 34:6-7);

Collins Rule 23 Opp. Aff., Ex. A, at 5 (Second Flores Decl. ¶ 11), 8 (Second Ibarra Decl.

¶ 13), 13 (Kabba Decl. ¶ 8), 20 (Perez Decl. ¶ 5); Second Collins Rule 23 Aff., Ex. 1

(Capelez Decl. ¶ 12)), Montano testified during her deposition that she saw Ms. Ochoa enter

a guest room, take two dollars in tip money, and put it in her bra, (see Madia Rule 23 Decl.,

Ex. F (Montano Dep. 20:22–21:14)).

It appears that at least one housekeeper brought this issue to the attention of a

supervisor.  During her deposition, Opt-in Plaintiff Montano testified as follows regarding a

meeting with Ms. Smith (Fairfield's General Manager), Ms. Ochoa, Ms. Torres, and Opt-in

Plaintiff Gomez:

> And so I spoke with [Gomez] and [Torres].  And I asked, "Well, why aren't
> they respecting us?"  Because they would ask us to punch in before finishing
> the rooms, and they made us work before punching in in the morning.  And

to Defendants' arguments.

> they would take our tips, because they would check the rooms before we
> would open them. . . . And so I told all of that to [Smith].  I said it all in front
> of them.  And [Smith] said, "Why are you doing that?  Why are you doing all
> of those things?  You have to respect the housekeepers."  And [Ochoa] said,
> "Well, I take the orders from Kevin."

(Id., Ex. F (Montano Dep. 12:19–13:10).)

### E.     National Origin

Plaintiffs also assert a claim for national origin discrimination.  Relevant to that

claim, Plaintiffs Rodriguez, Montano, and Rocha were born in El Salvador, (Madia Rule 23

Decl., Ex. C (Rodriguez Dep. 128:22-24), Ex. F (Montano Dep. 7:21-22); Collins SJ Aff.,

Ex. 1 (Rocha Dep. 7:15-19)); Plaintiffs Cruz, Felicia Reyes, and Juana Reyes were born in

the Dominican Republic, (Madia Rule 23 Decl., Ex. B (Cruz Dep. 8:8-15), Ex. D (F. Reyes

Dep. 114:1-3), Ex. G (J. Reyes Dep. 12:17-18)); Plaintiff Cortes was born in Mexico,

(Collins Rule 23 Opp. Aff., Ex. D (Cortes Dep. 45:11-14)); and Plaintiffs Cory and Collins

were born in the United States, (Collins Rule 23 Opp. Aff., Ex. C-1 (Cory Dep. 34:25–

25:1), Ex. E (Collins Dep. 98:14-15)).  Plaintiffs Rodriguez, Felicia Reyes, Juana Reyes,

Cortes, Montano, and Rocha testified during their depositions that nobody made negative

comments to them or treated them differently because of where they are from.  (See Madia

Rule 23 Decl., Ex. C (Rodriguez Dep. 128:22-24), Ex. D (F. Reyes Dep. 114:7-9), Ex. G (J.

Reyes Dep. 34:11-25), Ex. F (Montano Dep. 91:16-20); Collins Rule 23 Opp. Aff., Ex. D

(Cortes Dep. 93:14-17); Collins SJ Aff., Ex. 1 (Rocha Dep. 58:14-16).)  Plaintiffs

Rodriguez and Cory testified that they thought everyone was treated the same.  (See Madia

Rule 23 Decl., Ex. C (Rodriguez Dep. 129:13-17); Collins Rule 23 Opp. Aff., Ex. C-1 (Cory

Dep. 64:14-19).)  And, Named Plaintiff Cruz testified that some housekeepers from El

Salvador were treated better than she was treated, and some were treated worse.  (Madia Rule 23 Decl., Ex. B (Cruz Dep. 128:24–129:25).)  Similarly, Opt-in Plaintiff Collins testified that "a lot" of housekeepers were treated worse than she was, but she was unable to say whether any were treated better than she was.  (See Collins Rule 23 Opp. Aff., Ex. E (Collins Dep. 101:1-6).)

## III.  DISCUSSION

In December 2014, Plaintiffs moved to amend their Complaint to add Count VI, a cause of action under the Minnesota Payment of Wages Act ("MPWA").  (See Pls.' Mem. in Supp. of Pls.' Mot. to Amend the Compl. [Doc. No. 45] ("Pls.' Mot. to Amend Mem.") at 4–5.)  The Magistrate Judge granted that Motion on May 13, 2015, (Order dated May 13, 2015 [Doc. No. 66] ("MJ Order") at 8), and Plaintiffs filed their First Amended Complaint on May 15.  Defendants then filed objections to that Order, as well as their Motion for Summary Judgment.  The Court will first address Defendants' Objections to the Magistrate Judge's Order.

### A.      Objections to the Magistrate Judge's Order

In their Motion to Amend the Complaint, Plaintiffs sought to add an additional cause of action based on their allegations that Defendants stole Plaintiffs' tips and required Plaintiffs to work off the clock.  (Pls.' Mot. to Amend Mem. at 1.)  More specifically, Plaintiffs sought to add claims under Minnesota Statutes § 181.032 for failing to state on Plaintiffs' earnings statements the total number of hours Plaintiffs actually worked, Minnesota Statutes § 181.03 for taking Plaintiffs' tips and failing to pay Plaintiffs for all hours worked, and Minnesota Statutes § 181.101 for failing to pay Plaintiffs all wages

earned at least once every 31 days.  (See First Am. Compl. ¶ 103.)  The Magistrate Judge

granted Plaintiffs' Motion, finding that he could not determine at that stage of the litigation

that any of the proposed claims were futile.  (See MJ Order at 5–8.)

     In their objections, Defendants argue that the Magistrate Judge's decision is contrary

to law because the asserted claims could not withstand a motion to dismiss.  (See Defs.'

Objs. to the Magistrate Judge's Order of May 1[3], 2015 [Doc. No. 69] at 1.)  Those

objections were pending at the time Defendants filed their Motion for Summary Judgment,

and the parties again addressed the merits of the MPWA claims in their summary judgment

briefing.  (See Defs.' Mem. in Support of Mot. for Summ. J. [Doc. No. 89] ("Defs.' SJ

Mem.") at 24–32; Pls.' Mem. in Opp. to Defs.' Mot. for Summ. J. [Doc. No. 93] ("Pls.' SJ

Opp.") at 18–21.)  Because the Court finds that Defendants are entitled to summary

judgment on the §§ 181.032 and 181.03 claims, Defendants' objections to the Magistrate

Judge's Order in that regard are denied as moot.  As for the § 181.101 claim, the Court finds

that the Magistrate Judge's ruling was not clearly erroneous, for the reasons discussed

below in Part III.B.6.c., and overrules Defendants' objections in that regard.  Accordingly,

Plaintiffs are permitted to pursue their § 181.101 claim.

### B.    Defendants' Motion for Summary Judgment

     As for Defendants' Motion for Summary Judgment, "[s]ummary judgment

procedure is properly regarded not as a disfavored procedural shortcut, but rather as an

integral part of the Federal Rules as a whole, which are designed 'to secure the just,

speedy, and inexpensive determination of every action.'"  Celotex Corp. v. Catrett, 477

U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1).  Summary judgment is proper if,

drawing all reasonable inferences in favor of the non-moving party, there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); Celotex Corp., 477 U.S. at 322–23; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249–50 (1986).  A dispute over a fact is "material" only if its resolution might affect the outcome of the lawsuit under the substantive law.  Anderson, 477 U.S. at 248.  A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the non-moving party."  Id.

Although the party moving for summary judgment bears the burden of showing that the material facts in the case are undisputed, Celotex Corp., 477 U.S. at 323, "a party opposing a properly supported motion for summary judgment may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial," Anderson, 477 U.S. at 256.  Thus, the movant is entitled to summary judgment where the nonmoving party has failed "to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex Corp., 477 U.S. at 322.  No genuine issue of material fact exists in such a case because "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  Id. at 323. Defendants seek summary judgment on each of Plaintiffs' claims.  (Defs.' SJ Mem. at 15–42.)

### 1.    FLSA

In Count I, Plaintiffs allege that Defendants violated the FLSA by requiring them to work off the clock and, accordingly, failing to pay them at least minimum wage for all

hours worked and overtime compensation for hours worked in excess of forty.  (See First

Am. Compl. ¶¶ 64–65.)  As discussed above, there are seven Opt-in Plaintiffs who have

joined the Named Plaintiffs in bringing this FLSA claim.  Defendants argue that the

minimum wage and overtime claims fail as to each of these Plaintiffs.  (See Defs.' SJ

Mem. at 38–42.)

### a.      Minimum wage

The FLSA provides that "[e]very employer shall pay to each of his employees

who in any workweek is engaged in commerce . . . or is employed in an enterprise

engaged in commerce," a minimum wage.  29 U.S.C. § 206(a)(1).  Thus, "to establish a

violation of the minimum wage requirements of the FLSA, a plaintiff . . . must

demonstrate that he was engaged in compensable activity within the meaning of the

statute and that the wages received for that activity, if any, were below the statutory

minimum wage."  Hensley v. MacMillan Bloedel Containers, Inc., 786 F.2d 353, 355

(8th Cir. 1986).  "However, no violation occurs 'so long as the total weekly wage paid by

an employer meets the minimum weekly requirements of the statute, such minimum

weekly requirement being equal to the number of hours actually worked that week

multiplied by the minimum hourly statutory requirement.'"  Id. at 357 (quoting United

States v. Klinghoffer Bros. Realty Corp., 285 F.2d 487, 490 (2d Cir. 1960)).  Relevant to

this case, FLSA sets the minimum wage at $7.25 per hour.  29 U.S.C. § 206(a)(1)(C).

Relying on a chart compiled by Defendants' counsel, Defendants argue that there

is no genuine issue of fact as to whether Plaintiffs were paid more than the minimum

wage.  (Defs.' SJ Mem. at 39 (citing Collins SJ Aff., Ex. 4).)  More specifically,

Defendants assert that "there is no evidence that FLSA Plaintiffs worked so many unpaid hours in any given week that their average wage was less than $7.25 per hour."  (Id.)  In opposition, Plaintiffs argue that Defendants' position is "flatly contradicted" by the FLSA Plaintiffs' testimony.  (Pls.' Opp. at 26.)  Plaintiffs argue that, if they prove their off-the-clock-work allegations, then "TMI definitively violated minimum wage regulations according to its own time records."  (Id.)

The Court finds that there is a fact issue as to whether the FLSA Plaintiffs were paid the minimum wage for all hours worked.  For example, using information compiled by Plaintiffs' expert witness for each FLSA Plaintiff (including the median number of recorded hours per week, the median estimated number of hours worked off the clock per week, the median estimated total number of hours worked per week, and the starting wage), it appears that only two FLSA Plaintiffs—Montano and Rodriguez—were paid less than minimum wage:

| Plaintiff | Median Weekly Recorded Hours | Median Estimated Weekly Off-the-Clock Hours[4] | Estimated Weekly Total Hours | Starting Wage[5] | Estimated Weekly Wage |
|---|---|---|---|---|---|
| Collins | 34.00 | 4.50 | 38.50 | $9.00 | $7.95 |
| Cortes | 35.75 | 4.50 | 40.25 | $8.50 | $7.55 |
| Cory | 35.13 | 4.50 | 39.63 | $8.25 | $7.31 |
| Cruz | 34.00 | 4.50 | 38.50 | $8.25 | $7.29 |
| Gomez | 44.50 | 4.50 | 49.00 | $10.96 | $9.95 |
| Montano | 38.50 | 5.00 | 43.50 | $8.00 | $7.08 |
| Reyez, F. | 36.50 | 3.50 | 40.00 | $8.75 | $7.98 |
| Reyes, J. | 38.00 | 1.625 | 39.63 | $8.00 | $7.67 |
| Rocha | 36.25 | 2.50 | 38.75 | $8.25 | $7.72 |
| Rodriguez, A. | 38.00 | 4.50 | 42.50 | $8.00 | $7.15 |

(See Madia Rule 23 Decl., Ex. I (Siebrasse Expert Report at Schedule 2.1).)

That being said, Plaintiffs also have identified several pay stubs that—when combined with the median estimated number of hours worked off the clock—show that the wages paid to several more of these FLSA Plaintiffs may have fallen below the minimum wage in particular weeks. For example, the time card reports for Opt-in Plaintiffs Cortes, Cory, and Rocha show that they worked 21.75, 28.50, and 15.75 hours, respectively, for a wage of $8.50, $8.25, and $8.25 per hour, respectively, in a specific

---

[4]     Plaintiffs' expert witness was not provided with an estimate of the number of hours worked off the clock by Plaintiffs Collins, Cory, and Gomez. (See Madia Rule 23 Decl., Ex. I (Siebrasse Expert Report at Schedule 2.1).) Accordingly, for purposes of these calculations, the Court is relying on the median estimated number of off-the-clock hours worked by all of the FLSA Plaintiffs, which was 4.5. (See id.) That number appears to be higher than the estimates provided by Plaintiffs Collins and Cory during their depositions (and, therefore, provides a more favorable view of the evidence).

[5]     Plaintiffs' expert also included the ending wage and median wage of each Plaintiff. However, because the evidence must be viewed in the light most favorable to Plaintiffs on this Motion, the Court uses the lower starting wage for purposes of calculating the estimated weekly wage.

week.  (Collins Aff. in Supp. of Defs.' Mot. for Decert. [Doc. No. 63] ("Collins Decert.

Aff."), Ex. 15 (Rocha Time Card Report at 1), Ex. 22 (Cortes Time Card Report at 8), Ex.

26 (Cory Time Card Report at 2).)  After including their estimates of time worked off the

clock, however, their wages for those weeks dropped below $7.25 per hour:

| Plaintiff | Recorded Hours | Median Estimated Off-the-Clock Hours | Estimated Total Hours | Wage | Estimated Weekly Wage |
|---|---|---|---|---|---|
| Cortes | 21.75 | 4.50 | 26.25 | $8.50 | $7.04 |
| Cory | 28.50 | 4.50 | 33.00 | $8.25 | $7.13 |
| Rocha | 15.75 | 2.50 | 18.25 | $8.25 | $7.11 |

Because it is possible that—if Plaintiffs prove their off-the-clock work allegations—a

reasonable jury could conclude from this type of evidence that Plaintiffs were paid less

than minimum wage in certain weeks, Defendants' Motion is denied as to Plaintiffs'

minimum wage claims.

### b.    Overtime

The FLSA also prohibits the employment of any person "for a workweek longer

than forty hours unless such employee receives compensation for his employment in

excess of the hours above specified at a rate not less than one and one-half times the

regular rate at which he is employed."  29 U.S.C. § 207(a)(1).  "An employee who sues

for unpaid overtime has the burden of proving that he performed work for which he was

not properly compensated."  Lopez v. Tyson Foods, Inc., 690 F.3d 869, 874 (8th Cir.

2012) (citation and internal quotation marks omitted).  However, "[i]f an employer has

failed to keep records, employees are not denied recovery under the FLSA simply

because they cannot prove the precise extent of their uncompensated work."  Holaway v.

Stratasys, Inc., 771 F.3d 1057, 1059 (8th Cir. 2014).  Rather, in that situation:

> employees are to be awarded compensation based on the most accurate basis possible.  Under this relaxed standard of proof, once the employee has shown work performed for which the employee was not compensated, and sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference, the burden then shifts to the employer to produce evidence to dispute the reasonableness of the inference.

Id. (internal citations and quotation marks omitted).

Defendants argue that summary judgment is appropriate as to the claims of Opt-in

Plaintiff Collins because, even assuming that she worked off the clock for one-and-a-half

to four-and-a-half hours per week, as she testified, she did not work more than 35.5 hours

in any week.  (Defs.' SJ Mem. at 39.)  Defendants also assert that Plaintiffs Cruz, Felicia

Reyes, Rodriguez, Montano, Cortes, Cory, and Juana Reyes have failed to meet their

burden on summary judgment because they have not identified any specific days or hours

worked and it would be impossible for a jury to approximate damages.  (Id. at 40–42.)

Plaintiffs, on the other hand, argue that their testimony regarding the number of hours

that they worked off the clock is sufficient to survive summary judgment if the estimates

are reasonable, and that "[a] jury could—as a matter of just and reasonable inference—

conclude that Plaintiffs worked the additional hours that they estimated."  (Pls.' SJ Opp.

at 28.)

The Court finds that Defendants are entitled to summary judgment on the overtime

claim of Opt-in Plaintiff Collins.  Plaintiffs did not contest that argument in their

opposition brief, and even the charts compiled by Plaintiffs' expert witness show that

Plaintiff Collins did not work in excess of forty hours in any week.  (Madia Rule 23

Decl., Ex. I (Siebrasse Expert Report at Schedule 1.3).)  In fact, according to Plaintiffs'

expert, the only basis for Collins's alleged damages is unpaid regular compensation.  (Id.

at Schedules 1.1–1.3).)  Accordingly, Opt-in Plaintiff Collins's FLSA claim is dismissed

to the extent that it is based on nonpayment of overtime compensation.

The Court does not, however, agree that the remaining FLSA Plaintiffs' overtime

claims fail as a matter of law.  Defendants attempt to analogize this case to Holaway v.

Stratasys, Inc., where the Eighth Circuit affirmed the district court's dismissal of the

plaintiff's FLSA overtime claim.  771 F.3d at 1060.  In that case, the Eighth Circuit

determined that the plaintiff "failed to meet even the relaxed evidentiary standard because

he failed to put forward any evidence of the amount and extent of his work in excess of

forty hours a week for any week."  Id. at 1059.  The court found that the plaintiff's

assertions of the overtime hours he worked were "contradictory and bare," that he "failed

to specifically account for the hours worked," that he "failed to put forth any evidence

regarding specific weeks where he worked beyond forty hours," that he "failed to provide

a meaningful explanation of how he arrived at his final estimate," and that he instead

"provided only vague testimony and failed to reference specific days and hours worked."

Id. at 1059–60.  Accordingly, the court concluded that "the evidence [was] inconsistent

and provide[d] no details which would allow a jury to determine [the plaintiff] worked

beyond forty hours in any specific week of his employment."  Id. at 1060.

Defendants' analogy is misplaced.  Unlike the plaintiff in Holaway, Plaintiffs here

have put forth evidence that specifically accounts for the hours they allegedly worked off

the clock.  For example, Plaintiffs testified that they were required to fold linens before

punching in for work and were required to finish cleaning rooms after punching out.  In

addition, Plaintiffs' estimates of the time they worked off the clock were per week.  In

other words, Plaintiffs testified that they were required to work off the clock every week.

Finally, unlike the plaintiff in Holaway, Plaintiffs have detailed how they arrived at their

final estimate through their expert's report, which includes the number of hours each

FLSA Plaintiff actually worked in specific weeks (based on their pay records) and the

number of hours they claimed to have worked off the clock.  (See Madia Rule 23 Decl.,

Ex. I (Siebrasse Expert Report at App'x B & Schedules 1.3–1.12).)  Therefore, with the

exception of Opt-in Plaintiff Collins, the Court finds that Plaintiffs have put forth

sufficient evidence from which a reasonable jury could—as a matter of just and

reasonable inference—determine that Plaintiffs worked beyond forty hours in certain,

specific weeks of their employment.  Accordingly, Defendants' Motion is denied in this

regard.

### 2.  MFLSA

In Count II, Plaintiffs allege that Defendants violated the MFLSA by failing to pay

Plaintiffs at least minimum wage for all hours worked, taking tips left by hotel guests for

Plaintiffs, failing to provide Plaintiffs with adequate rest and meal breaks, and failing to

maintain accurate time records of the hours worked by Plaintiffs.  (See First Am. Compl.

¶¶ 71–74.)  As Defendants point out, Plaintiffs have since abandoned their minimum

wage claim under the MFLSA.  (See Pls.' Rule 23 Mem. at 15 n.9.)  The Court assumes

that Plaintiffs have likewise abandoned their MFLSA recordkeeping claim.  First,

Plaintiffs failed to identify in their First Amended Complaint or their briefing on the pending motions which specific MFLSA provision governs that claim.  (See First Am. Compl. ¶ 74; Pls.' SJ Opp. at 22–25; Pls.' Rule 23 Mem. at 15.)  Second, they failed to respond to Defendants' assertions that summary judgment is appropriate on Plaintiffs' "vague 'recordkeeping' violations" allegations, (Defs.' SJ Mem. at 36; see Pls.' SJ Opp. at 22–25), and to Defendants' argument that Plaintiffs are not permitted to "bootstrap" a recordkeeping claim onto their substantive claims for uncompensated time, (Defs.' Mem. of Law Opposing Pls.' Mot. for Rule 23 Class Cert. [Doc. No. 58] at 34; see Pls.' Reply Mem. in Supp. of Rule 23 Class Cert. [Doc. No. 65] at 9–11).[6]  Accordingly, Plaintiffs have not demonstrated that there is a genuine issue for trial on that claim, and summary judgment is appropriate as to the minimum wage and recordkeeping claims asserted in Count II.  The Court will address only the viability of Plaintiffs' tips and rest- and meal-break claims under the MFLSA.

---

[6]     Even if Plaintiffs had not abandoned this portion of their MFLSA claim, the Court finds that it fails.  Under § 177.30 of the MFLSA, employers must make and keep records that include "the hours worked each day and each workweek by the employee."  Minn. Stat. § 177.30(a)(3).  As discussed in more detail below, however, courts within this District have not permitted plaintiffs to pursue a claim under this provision where the claim is based on allegations that the plaintiffs were forced to work off the clock and so did not report to their employer all of the hours that they worked.  For example, in LePage v. Blue Cross & Blue Shield of Minnesota, the plaintiff-employees alleged that the defendant violated § 177.30 by "fail[ing] to maintain records for certain time before and after their scheduled shift" even though the plaintiffs had not reported the time on their time cards.  Civ. No. 08-584 (RHK/JSM), 2008 WL 2570815, at *5 (D. Minn. June 25, 2008).  The court dismissed the plaintiffs' claim, finding that they were trying to "bootstrap" a recordkeeping claim onto their substantive claim that they were not paid overtime.  Id.  Plaintiffs' MFLSA recordkeeping claim is similarly based on time for which they were allegedly required to work off the clock, and this Court finds that Defendants are entitled to summary judgment on that claim.

### a.    Tips

Although not identified in the First Amended Complaint, it appears from

Plaintiffs' Rule 23 class certification briefing that their MFLSA tip claim is asserted

under Minnesota Statutes § 177.24.  (See Pls.' Mem. in Supp. of Rule 23 Class Cert.

[Doc. No. 56] ("Pls.' Rule 23 Mem.") at 20.)  Under that statutory provision, "[n]o

employer may require an employee to contribute or share a gratuity received by the

employee with the employer or other employees or to contribute any or all of the gratuity

to a fund or pool operated for the benefit of the employer or employees."  Minn. Stat.

§ 177.24, Subd. 3.[7]  In other words, as Defendants point out, "[t]he only tip-related

practice prohibited by the MFLSA is mandatory 'tip-sharing' or 'tip-pooling.'"  (Defs.'

SJ Reply at 7.)

Plaintiffs' claim fails because it is not based on allegations of the type of conduct

that is prohibited by § 177.24.  Plaintiffs have not alleged that they were required to share

or pool their tips.  Instead, Plaintiffs allege that Defendants "took," "seiz[ed]," or "stole"

Plaintiffs' tips.  (See, e.g., First Am. Compl. ¶¶ 72, 75; Pls.' Rule 23 Mem. at 20; Pls.' SJ

Opp. at 13.)  In fact, Plaintiffs even assert that "TMI stole the tips, not that it improperly

divided them among housekeepers."  (Pls.' SJ Opp. at 17.)  And, Plaintiffs argue that the

evidence supports their allegations because it demonstrates that Ms. Ochoa covertly

entered the guest rooms and took the money that guests left for the housekeepers before

---

[7]      Although the MFLSA's tip-sharing provision was amended effective August 1,
2011, which falls within the time period relevant to this lawsuit, the statutory language at
issue here was the same in both versions of the statute.  Compare Minn. Stat. § 177.24,
Subd. 3 (2009), with Minn. Stat. § 177.24, Subd. 3 (2011).

the housekeepers went into the rooms.  While this evidence may allow a trier of fact to

find Defendants liable for conversion, as discussed in more detail below, it is not

sufficient—as a matter of law—to support a MFLSA claim.  Accordingly, Defendants are

entitled to summary judgment as to the tips-related portion of Count II.

### b.    Rest breaks

In regard to rest breaks, the MFLSA provides that "[a]n employer must allow each

employee adequate time from work within each four consecutive hours of work to utilize

the nearest convenient restroom."  Minn. Stat. § 177.253, Subd. 1.  Defendants argue that

Plaintiffs have failed to put forth any evidence that they were denied these breaks.

(Defs.' SJ Mem. at 36.)  Rather, Defendants contend, no Plaintiff testified that she was

denied a restroom break, and several housekeepers testified that they were never

instructed not to take a restroom break and did, in fact, take breaks.  (Id. at 37.)

Plaintiffs, on the other hand, assert that the issue is whether Defendants allowed

"adequate" time for rest breaks, and that the evidence demonstrates that they did not.

(See Pls.' SJ Opp. at 22–25.)

The Court agrees with Plaintiffs that there is a genuine issue for trial on their rest

break claim.  First, at least two Plaintiffs testified that they were not allowed to take breaks.

Second, although several housekeepers testified that they were never told that they were not

allowed to take a restroom break, many testified that they had to take a restroom break

quickly, while they were cleaning a room.  From this testimony, a reasonable jury could

conclude that Plaintiffs were not allowed "adequate time from work" within which to utilize

a restroom.  Accordingly, Defendants are not entitled to summary judgment as to the rest

break-related portion of Count II.

### c.      Meal breaks

In regard to meal breaks, the MFLSA provides that "[a]n employer must permit

each employee who is working for eight or more consecutive hours sufficient time to eat

a meal."  Minn. Stat. § 177.254, Subd. 1.  Defendants concede that summary judgment is

not appropriate as to all of Plaintiffs' meal-break claims.  (Defs.' SJ Reply at 15.)  They

seek dismissal only as to two sets of claims:  (1) the claims of Opt-in Plaintiff Juana

Reyes, who testified that she always took a paid lunch break, and of the seven

housekeepers who submitted sworn declarations stating that they took a meal break; and

(2) any claim based on a shift of less than eight hours.  (Defs.' SJ Mem. at 37–38.)  As

for the latter set of claims, Defendants assert that, even if it is assumed that Plaintiffs

worked off the clock, they consistently worked shifts that were less than eight hours.  (Id.

at 38.)  In opposition, Plaintiffs argue that the MFLSA mandates a thirty-minute meal

break and that no housekeeper testified that she was provided with such a break.  (Pls.' SJ

Opp. at 25.)  Rather, Plaintiffs argue, summary judgment is inappropriate because most

housekeepers testified that they were not given any time for a meal break or, at most, that

they were able to take a fifteen-minute break.  (Id.)

The Court finds that the MFLSA's plain language requires a meal break only

when an employee works an eight-or-more-hour shift.  See Grieve v. Prairie Dental Ctr.,

P.A., No. C0-93-1021, 1993 WL 469181, at *2 (Minn. Ct. App. Nov. 16, 1993)

("Because [the employee] worked longer than eight hour shifts, she was entitled to

'sufficient time to eat a meal.'"). Accordingly, the Court agrees that Defendants are entitled to summary judgment as to all meal-break claims that are based on a shift of less than eight hours.

The Court does not agree, however, that Defendants are entitled to summary judgment on the claims of Opt-in Plaintiff Juana Reyes or the other seven housekeepers who submitted sworn declarations regarding their meal breaks. Although Reyes testified that she was always able to take a lunch break, she also testified that the breaks were "fast" and "usually less than half an hour." And, although the other referenced housekeepers stated that they were never told that they could not take a meal break and that they did take meal breaks, those housekeepers also stated that they often did not take a break to eat, took only a fifteen-to-thirty minute break, or ate in the room that they were cleaning. Thus, whether those housekeepers had "sufficient time" to eat their meals is a question of fact for a jury.

### 3.      Minnesota Statutes § 181.79—Unlawful deductions

In Count III, Plaintiffs allege that Defendants made unlawful deductions from Plaintiffs' wages by taking their tips without authorization in violation of Minnesota Statutes § 181.79. (First Am. Compl. ¶ 80.) That statutory provision states:

> No employer shall make any deduction, directly or indirectly, from the wages due or earned by any employee . . . for lost or stolen property, damage to property, or to recover any other claimed indebtedness running from employee to employer, unless the employee, after the loss has occurred or the claimed indebtedness has arisen, voluntarily authorizes the employer in writing to make the deduction or unless the employee is held liable in a court of competent jurisdiction for the loss or indebtedness. . . .

Minn. Stat. § 181.79, Subd. 1(a).  According to the Minnesota Supreme Court, this statute "is clear that the employer cannot use self help to enforce a claimed indebtedness against an employee by a unilateral offset."  Brekke v. THM Biomed., Inc., 683 N.W.2d 771, 776 (Minn. 2004).  Statutory provisions such as this, which provide for a penalty, are strictly construed.  Id. at 774.

Plaintiffs argue that a fact-finder could rely on Ms. Ochoa's statements that "we have to collaborate with the hotel because they pay the rent and the food and our bills and the baby-sitter" to conclude that the tips were stolen "to recover any other claimed indebtedness."  (Pls.' Opp. at 17.)  Defendants, on the other hand, argue that Plaintiffs' claim fails because they cannot demonstrate that there was a "deduction," that the "employer" took the deduction, or that the deduction was for lost or stolen property, damage to property, or to recover a claimed indebtedness.  (Defs.' SJ Mem. at 32.)  In addition, Defendants assert that the statement relied upon by Plaintiffs is inadmissible double-hearsay because it actually was Opt-in Plaintiff Montano who claimed that Ms. Ochoa made that statement and, even if it were admissible, it is irrelevant because it was made not in regard to tips but in response to a question about why the housekeepers were required to go to work early.  (Defs.' SJ Reply at 6–7.)

The Court agrees with Defendants that Plaintiffs have failed to raise a genuine issue for trial on this claim.  The only fact put forth by Plaintiffs in support of this cause of action is the statement allegedly made by Ms. Ochoa.  However, as Defendants note, Plaintiffs have taken that statement out of context.  When Opt-in Plaintiff Montano

described Ms. Ochoa's statement, it was in response to a question about working off the

clock, not tip-stealing:

> Q.     Did [Sonja Ochoa] give you an order to do work before you punched
> in?
>
> A.     Yes.
>
> Q.     Did you have a discussion once where you asked Sonja, "Why do
> you make us come early?  Why do you want to cooperate with the
> hotel?  They're rich."
>
> A.     Yes.
>
> Q.     What was that conversation?  What did you say to her and what did
> she say to you?
>
> A.     I told her, "Why are you demanding for us to come early and come
> to work?"  And I told her, "With the hotel, we come here and we
> need to work.  We're poor and we do work.  But at the hotel, they're
> millionaires; they have lots of money.  So why would we come here
> to work without punching in?"  And Sonja said—well, I mean the
> hotel is millionaires and so we're poor.  And so the truth is, why are
> you asking us to work without punching in?  That's what I said.
>
> And then she said—she said again, and she said it before, this
> is what she always says, that we have to collaborate with the hotel
> because they pay the rent and the food and our bills and the baby-
> sitter.  Everything, everything, everything is from there, from the
> hotel.

(Madia Rule 23 Decl., Ex. F (Montano Dep. 92:24–93:23) (emphases added).)

Accordingly, even assuming that the statement could be construed to reference a

"claimed indebtedness"—which the Court doubts—no reasonable jury could find that it

supports the notion that Defendants stole—i.e., deducted—tips[8] for the purpose of

---

[8]     As Plaintiffs note, tips are considered to be wages for purposes of § 181.79.  See
Karl v. Uptown Drink, LLC, 835 N.W.2d 14, 18 (Minn. 2013).

recovering the debt.  Because Plaintiffs have failed to establish a genuine fact issue

regarding at least one essential element of their § 181.79 claim, Defendants are entitled to

summary judgment on Count III.

### 4.    Common law claims

In Count IV, Plaintiffs assert two common law claims against Defendants:  breach

of contract and conversion.

### a.    Breach of contract

Plaintiffs' first common law claim is for breach of contract.  They allege that

Defendants breached the terms of their employment agreement by failing to pay Plaintiffs

for all hours worked, failing to pay appropriate minimum and overtime wages, and by

stealing Plaintiffs' tips.  (First Am. Compl. ¶ 88.)  Over the course of briefing and

arguing this Motion, however, Plaintiffs have significantly narrowed their claim.  They

have dropped any reliance on tip-stealing as a basis for this claim, and they have

acknowledged that the claim is preempted by the FLSA to the extent that the claim is

based on overtime or minimum wage violations—i.e., hours worked in excess of forty

hours per week and hours worked under forty hours per week when Plaintiffs' pay was

below minimum wage.  (See, e.g., Pls.' SJ Opp. at 9–10.)  Thus, Plaintiffs solely maintain

that their breach of contract claim is viable to the extent that it is based on "unpaid hours

worked under 40 per week, for which they may not have been brought below minimum

wage, e.g. the unpaid hours between 35 and 40 per week."  (Id. at 10 (emphasis omitted).)

At the hearing, Plaintiffs' counsel referred to these hours as falling within a "doughnut

hole" that is not covered by the FLSA.

Defendants have argued that, to the extent that Plaintiffs are seeking recovery for the same alleged off-the-clock hours under both the FLSA and common law, the common law claims are preempted.  (Defs.' SJ Mem. at 17–18.)  In the alternative, Defendants assert that Plaintiffs' breach of contract claim fails because there was no legally-binding contract and because it is barred by accord and satisfaction.  (Id. at 18–20.)

### i.    Preemption

While it is true that "[c]ommon law claims based on the same facts and circumstances as an FLSA claim may be preempted under the FLSA," Roble v. Celestica Corp., Civ. No. 06-2934 (JRT/FLN), 2006 WL 3858396, at *3 (D. Minn. Dec. 29, 2006), Plaintiffs have narrowed the basis of their breach of contract claim to a portion of allegedly uncompensated time that falls under neither the overtime nor minimum wage provisions of the FLSA.  In arguing that their claim should be allowed to proceed on this basis, Plaintiffs point to Osby v. Citigroup, Inc., No. 07-cv-06085-NKL, 2008 WL 2074102 (W.D. Mo. May 14, 2008).  In that case, the district court determined that similar allegations were sufficient to allow the plaintiffs' unjust enrichment claim to survive a motion for judgment on the pleadings, along with their FLSA claim:

> [I]n this case, Plaintiffs assert that their unjust enrichment claims will not depend on establishing that [the defendant] violated the FLSA.  For example, Plaintiffs assert that some call center employees may have been paid an hourly rate that exceeds federal minimum wage, but did not work 40 hours in a seven-day period, but, nevertheless, performed work for [the defendant] which went unpaid.  This claim is consistent with Plaintiffs' Second Amended Complaint, and satisfies the minimal showing required to survive a motion for judgment on the pleadings.

Id. at *2.  The court went on to explain that if the plaintiffs' "theoretical non-overtime-but-uncompensated employee exists[,] . . . then the facts necessary to establish the FLSA claim and the unjust enrichment claim are not identical."  Id. at *2 n.1.

The Court agrees that such allegations are sufficient to state a claim for straight uncompensated time in breach of Plaintiffs' alleged employment contract, and the Court finds that Plaintiffs have raised a genuine issue for trial that such an employee exists.  For example, Plaintiffs point to the portions of Plaintiffs' expert's report that identify several Plaintiffs who allegedly are owed "unpaid regular compensation," including each of the Named Plaintiffs.  (Pls.' SJ Opp. at 9–10; Madia Rule 23 Decl., Ex. I (Siebrasse Expert Report at Schedule 1.1).)  Accordingly, Plaintiffs' breach of contract claim is not preempted to the extent that it is based on the allegedly uncompensated "doughnut hole" hours.

### ii.      Existence of a contract

In the alternative, Defendants assert that Plaintiffs' breach of contract claim fails because no contract was ever formed.  (Defs.' SJ Mem. at 19; Defs.' SJ Reply at 13–14.)  The Minnesota Supreme Court has explained the following in regard to employment contracts:

> Generally speaking, a promise of employment on particular terms of unspecified duration, if in form an offer, and if accepted by the employee, may create a binding unilateral contract.  The offer must be definite in form and must be communicated to the offeree.  Whether a proposal is meant to be an offer for a unilateral contract is determined by the outward manifestations of the parties, not by their subjective intentions.

Pine River St. Bank v. Mettille, 333 N.W.2d 622, 626 (Minn. 1983).  "The offer, though required to be definite in form and communicated to the offeree, may be inferred from words spoken or from the conduct of the parties, viewed objectively."  Ruud v. Great Plains Supply, Inc., 526 N.W.2d 369, 371 (Minn. 1995).  And, whether an oral or written statement is sufficiently definite to constitute an offer is a question of law for the Court. Martens v. Minn. Mining & Mfg. Co., 616 N.W.2d 732, 740 (Minn. 2000).  But, if the question is whether the employer made a statement at all, then the issue is a question of fact for the jury.  Id. at 740 n.9.

While Plaintiffs claim that Defendants offered them employment as housekeepers for a certain rate of pay for all hours worked and that they accepted the offer by going to work, (see Pls.' SJ Opp. at 10–11), Defendants assert that there was no definite offer because Plaintiffs have acknowledged that Defendants retained authority to change the hourly rate, (see Defs.' SJ Reply at 14).  Defendants also argue that Plaintiffs' allegations that they were told to work off the clock demonstrate either that any offer made was revoked or that Plaintiffs knew that there was no contract for payment regarding those hours.  (Defs.' SJ Reply at 13–14.)

The Court is not persuaded by Defendants' arguments.  First, Plaintiffs have submitted deposition testimony from each of the Named Plaintiffs that they were told during their interviews for the housekeeper position that they would be paid a certain wage, (see Madia Rule 23 Decl., Ex. B (Cruz Dep. 137:1-14), Ex. C (Rodriguez Dep. 60:3–61:9), Ex. D (F. Reyes Dep. 43:19–44:16, 74:9-25)), and Defendants have not challenged this evidence.

Second, Defendants cite no record support for the proposition that Plaintiffs acknowledge that Defendants retained authority to change the hourly rate.  Presumably, Defendants are relying on the witnesses' testimony that they received raises.  (See Madia Rule 23 Decl., Ex. B (Cruz Dep. 137:1-14), Ex. C (Rodriguez Dep. 60:3–61:9), Ex. D (F. Reyes Dep. 74:9-25).)  However, Defendants neither demonstrate why the offer of a pay raise would not constitute a new, "definite" offer, nor cite to any legal authority for the proposition that the award of a pay raise renders an employment offer indefinite.  On the contrary, "[a]n offeror of a unilateral contract always retains the power to modify or revoke the offer so long as the offeree has not begun performance, but retention of that power does not preclude the offer from becoming a contract once accepted by the offeree by tender of performance."  Feges v. Perkins Restaurants, Inc., 483 N.W.2d 701, 708 (Minn. 1992) (internal citation omitted).

Third, "an offer for a unilateral contract may neither be changed nor revoked once the offeree begins the performance requested by the offer."  Peters v. Mut. Benefit Life Ins. Co., 420 N.W.2d 908, 914 (Minn. Ct. App. 1988).  And, here, Plaintiffs have put forth evidence that they were offered a set wage for their work and that they accepted this offer by going to work prior to being told that they would have to work some hours off the clock.  In such a circumstance, Defendants would have been unable to revoke their offer for payment for time worked.  Accordingly, summary judgment is not appropriate on this issue.

### iii.  Accord and satisfaction

Finally, Defendants argue that Plaintiffs' breach of contract claim also is barred by accord and satisfaction.  (Defs.' SJ Mem. at 20.)  To succeed on a claim of accord and satisfaction, a party must prove that:

> (1) the party, in good faith, tendered an instrument to the claimant as full satisfaction of the claim; (2) the instrument or an accompanying written communication contained a conspicuous statement to the effect that the instrument was tendered as full satisfaction of the claim; (3) the amount of the claim was unliquidated or subject to a bona fide dispute; and (4) the claimant obtained payment of the instrument.

Nelson v. Am. Family Ins. Grp., 651 N.W.2d 499, 512 (Minn. 2002) (citation and internal quotation marks omitted).

Here, Defendants argue that all of the elements are met because the paychecks issued to Plaintiffs clearly stated that the amount tendered was payment for all work performed during a given pay period, and Plaintiffs accepted and cashed the paychecks. (Defs.' SJ Mem. at 20.)  Therefore, Defendants assert, Plaintiffs cannot now argue that they are entitled to more money for work performed during those pay periods.  (Id.) Plaintiffs, on the other hand, argue that there is no evidence that Defendants tendered the paychecks as full satisfaction of Plaintiffs' unpaid-hours claims or that those hours were the subject of a bona fide dispute at the time the checks were tendered.  (Pls.' SJ Opp. at 11–13.)  On the contrary, Plaintiffs assert, Defendants claim that they had no knowledge of Plaintiffs' claims until this lawsuit was commenced.  (Id. at 12–13.)  Finally, Plaintiffs argue, the checks do not contain a conspicuous statement that they were tendered as full

satisfaction of the unpaid-hours claims, but instead they identify the specific <u>clocked</u> hours for which the payment was tendered.  (<u>Id.</u> at 12.)

As Plaintiffs point out, the evidence demonstrates that Defendants were purportedly unaware of Plaintiffs' claims for compensation for off-the-clock work until this lawsuit was filed.  (<u>See</u> Madia Rule 23 Decl., Ex. A (Smith Dep. 28:13–34:18); Madia Decl. in Supp. of Pls.' Mem. in Opp. to Defs.' Mot. for Summ. J. [Doc. No. 94], Ex. N (Defs.' Answers to Pls.' First Set of Interrogs. at 12).)  If so, then the paychecks tendered by Defendants prior to this lawsuit could not have been tendered "as full satisfaction of the claim."  <u>See</u> <u>Roaderick v. Lull Eng'g Co.</u>, 208 N.W.2d 761, 764 (Minn. 1973) ("Before the acceptance of a paycheck by an employee can constitute an accord and satisfaction, it must appear that the employer made it clear that he knew the employee might dispute the amount and that he intended the check to be full payment for the employee's services.").

In addition, the paystubs from the paychecks do not contain any type of statement that can be construed as "a conspicuous statement to the effect that the instrument was tendered as full satisfaction of [Plaintiffs' unpaid-hours] claim[s]."  Rather, the paystubs simply state the employer's name and address, the employee's name, the check number and date, the pay period, the number of hours for which they were being paid, the "type" of hours and department in which the hours were worked, the rate of pay, and the amount of deductions.  (<u>See, e.g.</u>, Collins SJ Decl., Ex. 2 (Paystub for Y. Rocha).)  Therefore, Defendants have not demonstrated that accord and satisfaction applies to bar Plaintiffs' breach of contract claim.

For these reasons, Defendants' Motion is denied to the extent that Plaintiffs' breach of contract claim is based on the allegedly uncompensated "doughnut hole" hours. As to any other basis for this claim, Defendants' Motion is granted.

### b.   Conversion

Plaintiffs' second common law claim is for conversion of their tips.  (First Am. Compl. ¶¶ 91–92.)  Defendants argue that, not only do Plaintiffs' claims in Counts II and III (under the MFLSA and Minnesota Statutes § 181.79, respectively) preempt this common law claim, but that Plaintiffs also have not presented evidence to satisfy either element of conversion.  (Defs.' SJ Mem. at 21–24.)  In addition, Defendants assert that Plaintiffs pled only a direct conversion claim in their First Amended Complaint and have not proffered evidence demonstrating that Defendants are vicariously liable for the alleged acts of their employees.  (Defs.' Supplemental Mem. in Supp. of Mot. for Summ. J. [Doc. No. 98] ("Defs.' Supplemental SJ Mem.") at 1–2.)

Plaintiffs, in response, argue that they are permitted to pursue their conversion claim as an alternative to their statutory claims and that there is no legal or factual support for the proposition that housekeepers do not have a property interest in their tips. (Pls.' SJ Opp. at 16–17.)  Moreover, Plaintiffs claim that Defendants are vicariously liable for Ms. Ochoa's actions because she stole the tips within the scope of her employment and because Defendants had actual notice of her actions.  (Pls.' Supplemental Mem. in Opp. to Defs.' Mot. for Summ. J. [Doc. No. 99] ("Pls.' Supplemental SJ Opp.") at 1.)

### i.      Preemption

Plaintiffs and Defendants rely on this Court's opinion in <u>Huff v. Pinstripes, Inc.</u>, 972 F. Supp. 2d 1065 (D. Minn. 2013), to support their preemption arguments.  In that case, the plaintiff challenged the tip-pooling practices of his employer, asserting a claim under the MFLSA, a common law claim for conversion, and a common law claim for unjust enrichment.  <u>Id.</u> at 1067.  As for the parties' cross-motions for summary judgment on the common law claims, this Court held:

> Under Minnesota law, a party may not have equitable relief where an adequate remedy at law is available.  <u>United States v. Bame</u>, 721 F.3d 1025, 1030 (8th Cir. 2013) (citing <u>ServiceMaster of St. Cloud v. GAB Bus. Servs., Inc.</u>, 544 N.W.2d 302, 305 (Minn. 1996)). . . .  This Court has likewise held that "the availability of statutory claims (whether state or federal) will preclude the assertion of an unjust-enrichment or other equitable claim seeking the same relief."  <u>Cummins Law Office, P.A. v. Norman Graphic Co. Ltd.</u>, 826 F. Supp.2d 1127, 1132 (D. Minn. 2011).
>
> Plaintiff's common law claims for unjust enrichment and conversion regarding tip-sharing for regular bistro service are based on the same facts as those supporting his claims under [the MFLSA]. . . .  Not only does the tip-sharing statute provide an adequate legal remedy, this Court has granted Plaintiff that very legal remedy as it relates to the regular bistro service tip-sharing portion of Huff's claim, <u>supra</u>.  In addition, Plaintiff makes clear that he asserts his common law claims only in the alternative, stating, "the unjust enrichment and conversion claims arise only if the Court holds that Plaintiff does not have a legal remedy under the MFLSA for amounts contributed to the tip pool." . . .  Because Plaintiff has an adequate statutory remedy as to his regular bistro service tip-sharing claim, which this Court has granted, and because Plaintiff concedes summary judgment to Defendant on his conversion claim with respect to event service, Plaintiff's motion for summary judgment as to his conversion claim is denied, and Defendant's motion for summary judgment as to Plaintiff's claims for conversion and unjust enrichment is granted.

<u>Id.</u> at 1083–84.

Contrary to the plaintiff in <u>Huff</u> who won summary judgment on his statutory claim, this Court has granted <u>Defendants'</u> Motion for Summary Judgment as to Plaintiffs' statutory tip-stealing claim.  More specifically, the Court determined that the alleged tip-stealing is not governed by the asserted statutes—i.e., the MFLSA's tip-sharing provision and § 181.79's unlawful deductions provision.  Accordingly, because Plaintiffs do not have an adequate statutory remedy for the alleged theft of their tips, their conversion claim is not preempted.

### ii.    Prima facie case

"The elements of common law conversion are (1) the plaintiff has a property interest and (2) the defendant deprives the plaintiff of that interest." <u>Lassen v. First Bank Eden Prairie</u>, 514 N.W.2d 831, 838 (Minn. Ct. App. 1994) (citing <u>Larson v. Archer–Daniels–Midland Co.</u>, 32 N.W.2d 649, 650 (Minn. 1948)).  Plaintiffs claim that a finder of fact could rely on the housekeepers' testimony to conclude that the housekeepers have a property interest in the tips because common sense dictates that guests leave tips for the <u>housekeepers</u> to take.  (Pls.' SJ Opp. at 16–17.)  Plaintiffs also argue that there is sufficient evidence from which a finder of fact could conclude that Defendants stole those tips.  (<u>Id.</u> at 13.)  For example, Plaintiffs point to Opt-in Plaintiff Montano's testimony that she saw Ms. Ochoa steal tips, and the various Plaintiffs' testimony that they received fewer tips on days that Ms. Ochoa went into the guest rooms before the housekeepers went in.  (<u>Id.</u> at 13–14.)

Defendants, on the other hand, argue that Plaintiffs have not provided sufficient evidence of a property interest because they cannot show that a tip belongs to the person

who is about to clean the room rather than to the person who cleaned the room the previous day, (Defs.' SJ Mem. at 22), or that "the 'missing' tips actually existed," (Defs.' SJ Reply at 8).  They also argue that there is no admissible evidence that Defendants took any tips because several potential plaintiffs testified that no tips were stolen and the others are merely speculating that tips were stolen.  (See Defs.' SJ Mem. at 22–23.)

Viewing the evidence in the light most favorable to Plaintiffs, as the Court must at this stage of the proceedings, the Court finds that a reasonable jury could find that both conversion elements are met in this case.  A finder of fact could infer that tips had been left for the housekeepers and so the housekeepers had a property interest in the tips, and that Ms. Ochoa deprived the housekeepers of that property interest by taking those tips before the housekeepers found them.  The fact that Defendants have presented evidence to the contrary simply creates an issue of fact for the jury to resolve.

### iii.    Vicarious liability

Defendants argue that Plaintiffs' conversion claim also fails because Plaintiffs have no direct liability claim against Defendants and failed to plead that Defendants were vicariously liable for Ms. Ochoa's alleged tip-stealing.  (See Defs.' Supplemental SJ Mem. at 1–2.)  Moreover, Defendants assert, Plaintiffs' claim would fail even if properly pled because there is no evidence that the alleged theft was foreseeable or that it occurred within the scope of Ms. Ochoa's employment.  (See id.)  In opposition, Plaintiffs argue that Defendants had fair notice of their claims, and that vicarious liability does apply because Ms. Ochoa's alleged conduct occurred while she was on duty, and Defendants

had actual notice and apparent knowledge of her conduct.  (Pls.' Supplemental SJ Opp. at

1, 9.)

The Court agrees with Plaintiffs.  First, Rule 8 of the Federal Rules of Civil

Procedure requires only "a short and plain statement of the claim showing that the

pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  "In fact, a Plaintiff is not required to

plead the correct legal theory, or indeed any legal theory at all, just a short and plain

statement of the facts, and the Court must deny a Rule 12(b)(6) motion if it determines

the Plaintiff could recover under any possible legal theory consistent with those facts."

Njaka v. Wright Cnty., 560 F. Supp. 2d 746, 752 (D. Minn. 2008) (citation and internal

quotation marks omitted).  Here, Plaintiffs' conversion claim contains the following

allegations:

> 89.   Minnesota common law further prohibits conversion, the intentional interference with and dominion or control over the chattel of another that substantially interferes with the other's right to use such chattel.

> 90.   Plaintiffs and members of the proposed Minnesota Rule 23 class are the clear owners of the gratuity (tip) money left for them by hotel guests.

> 91.   Defendants wholly deprived Plaintiffs and members of the Minnesota Rule 23 class of their property interests in their gratuities by taking them from hotel rooms prior to Plaintiffs and members of the Rule 23 class entering the rooms to perform their duties.

> 92.   Defendants' conduct in taking Plaintiffs' and Rule 23 Class members' gratuities constitutes conversion.

(First Am. Compl. ¶¶ 89–92.)  Although these specific paragraphs of the First Amended

Complaint do not reference the actions of any of Defendants' employees, an earlier

paragraph in the pleading—which is incorporated by reference into the conversion

count—does reference the conduct of Ms. Ochoa and Ms. Torres, Defendants' Executive

and Assistant Executive Housekeepers:

> 49.   Defendants routinely take cash tips left by hotel guests for Vasquez
> Cruz, Rodriguez, Reyes, and other housekeepers.  Sonja and [Maira]
> make a practice of arriving at work prior to the housekeepers that they
> supervise so that they can move from room to room and collect cash
> tips left for housekeeping by hotel guests.

(Id. ¶ 49.)  These allegations were sufficient to put Defendants on notice of Plaintiffs'

claim and theory of liability.

Second, there is a genuine issue for trial as to whether Defendants are vicariously

liable for the alleged tip-stealing.  "In Minnesota, '[u]nder the doctrine of respondeat

superior, an employer is vicariously liable for the torts of an employee committed within

the course and scope of employment.'"  Rau v. Roberts, 640 F.3d 324, 328 (8th Cir.

2011) (quoting Frieler v. Carlson Mktg. Grp., Inc., 751 N.W.2d 558, 583 (Minn. 2008)).

An employer will only be liable for an employee's intentional tort if (1) the source of the

intentional tort is "'related to the duties of the employee,'" and (2) the tort occurs

"'within work-related limits of time and place.'"  Id. (quoting Lange v. Nat'l Biscuit Co.,

211 N.W.2d 783, 786 (Minn. 1973)).  As for the first element, "an important

consideration . . . is whether the act was foreseeable."  Hagen v. Burmeister & Assocs.,

Inc., 633 N.W.2d 497, 504 (Minn. 2001).  Here, Defendants argue that there is no

evidence that Ms. Ochoa's acts were foreseeable or that they occurred within the work-

related limits of time and place.  (Defs.' Supp. SJ Mem. at 5.)

"Whether an employee's acts were foreseeable within the context of respondeat

superior is a question of fact" and "is commonly proven . . . when a party establishes that

the type of tortious conduct involved is a well-known industry hazard." <u>Hagen</u>, 633

N.W.2d at 505.  Although Defendants argue that expert testimony may be required to

establish foreseeability, (<u>see</u> Defs.' Supplemental SJ Mem. at 10 n. 4), the Minnesota

Supreme Court's analysis in <u>Hagen v. Burmeister & Assocs., Inc.</u> demonstrates

otherwise.  In that case, the court stated:

> [T]he trial court found that <u>[the employer] did not know or have reason to
> know</u> that [the employee] did not make appropriate arrangements with [his
> former employer] before he sent out the letters [soliciting the former
> employer's clients]-the action that led up to his [Uniform Trade Secrets
> Act] violation.  <u>Thus, [the former employer] was required to introduce at
> trial some evidence tending to show that [the employee's] tortious act was
> foreseeable as that term is used in vicarious liability law</u>:  for example,
> evidence showing that the risk of employees misappropriating trade secrets
> is a well-known hazard in the insurance industry.

<u>Hagen</u>, 633 N.W.2d at 505 (emphases added).  Thus, a plaintiff can raise a fact issue as to

foreseeability by introducing evidence that the employer knew or had reason to know of

the employee's misconduct.  Plaintiffs have done so in this case through Opt-in Plaintiff

Montano's testimony that she told Fairfield's General Manager that the housekeepers' tips

were being stolen.

Next, in considering whether an employee's alleged conduct occurred within the

work-related limits of time and place, a court will consider whether the alleged conduct

occurred on the employer's premises, whether the employee had finished working for the

day and "clocked out," and whether the employee was in that location for job-related

purposes.  <u>See</u> <u>Rau</u>, 640 F.3d at 328–29.  However, an employee's motivation is not a

consideration—"an employee's act need not be committed in furtherance of his

employer's business to fall within the scope of his employment."  <u>Fahrendorff ex rel.</u>

Fahrendorff v. N. Homes, Inc., 597 N.W.2d 905, 910 (Minn. 1999) (citing Marston v.

Minneapolis Clinic of Psychiatry & Neurology, 329 N.W.2d 306, 311 (Minn. 1982);

Lange, 211 N.W.2d at 786).  Here, there is no dispute that the alleged conduct occurred at

the Fairfield, and Plaintiffs have presented evidence from which a reasonable jury could

conclude that Ms. Ochoa was clocked in at the time of the alleged tip-stealing and was at

the hotel to complete her Executive Housekeeper-related duties.  For example, Ms.

Ochoa testified that she normally arrives at work at seven o'clock in the morning and

immediately clocks in and begins her work, and that she clocks out at the end of the day

at the same time as the housekeepers and "[they] all leave together."  (Madia Rule 23

Decl., Ex. E (Ochoa Dep. 27:21–28:15, 41:3–42:7).)  And, contrary to Defendants'

assertions, the fact that Ms. Ochoa may also have testified that she had no reason to enter

uncleaned rooms before the housekeepers went in, (see id., Ex. E (Ochoa Dep. 39:11-

23)), does not eliminate this fact issue because, as discussed above, an employee's

motivation is not relevant.  Accordingly, Defendants are not entitled to summary

judgment on Plaintiffs' claim for conversion because there is a genuine issue for trial

regarding whether Ms. Ochoa stole Plaintiffs' tips and, if so, whether Defendants are

liable for that theft.

### 5.    MHRA—National origin discrimination

In Count V, Plaintiffs assert that Defendants subjected them to disparate treatment

and harassment because of their "national origin and limited English skills," in violation of

the MHRA.  (First Am. Compl. ¶ 97.)  A plaintiff may survive a motion for summary

judgment on a MHRA claim either by providing direct evidence of discrimination (i.e., "a

40

specific link between the alleged discriminatory animus and the challenged decision,

sufficient to support a finding by a reasonable fact finder that an illegitimate criterion

actually motivated the adverse employment action"), or "by creating the requisite inference

of unlawful discrimination through the McDonnell Douglas analysis, including sufficient

evidence of pretext."  Torgerson v. City of Rochester, 643 F.3d 1031, 1044 (8th Cir. 2011)

(internal citations and quotation marks omitted).  "Under the McDonnell Douglas

framework, [the plaintiff] must first establish a prima facie case of discrimination."  Id. at

1046.  Thus, in a national origin discrimination case, a plaintiff "must establish that (1) she

is a member of a protected class, (2) she met [the employer's] legitimate expectations,

(3) she suffered an adverse employment action, and (4) the circumstances give rise to an

inference of discrimination."  Guimaraes v. SuperValu, Inc., 674 F.3d 962, 974 (8th Cir.

2012).

Defendants argue that Count V must be dismissed because Plaintiffs have failed to

establish their prima facie case.  (Defs.' SJ Mem. at 16.)  In particular, Defendants assert

that there is no evidence that Plaintiffs were treated differently due to their national origin

and that, in fact, the evidence shows that individuals from all countries were treated the

same.  (Id.)  In opposition, Plaintiffs acknowledge that their allegations of exploitation based

on their "vulnerable status as uneducated . . . immigrants with varying states of

documentation" is "a unique theory for unlawful discrimination," and that they have found

no precedent to support their claim.  (Pls.' SJ Opp. at 21.)  While Plaintiffs argued that a

jury could "infer that [Defendants] targeted Hispanic immigrants" from the fact that

Defendants did not hire any Caucasian individuals for housekeeping positions during the

relevant time period and made threats based on citizenship status, (id. at 22), counsel for Plaintiffs conceded at the hearing on this matter that it would be difficult to prove national origin discrimination because there also have been African-American individuals who were subjected to the same adverse employment practices.

The Court finds that Plaintiffs have failed to make out a prima facie case of national origin discrimination. As Defendants point out, Named Plaintiffs Rodriguez and Felicia Reyes testified that nobody made negative comments to them about their national origin, Named Plaintiff Cruz testified that some housekeepers of her same national origin were treated better than she was treated and some were treated worse, and several of the Opt-in Plaintiffs testified that everyone was treated the same. Accordingly, not only does it appear that Plaintiffs' claims are impermissibly based on their citizenship status rather than their national origin, see Espinoza v. Farah Mfg. Co., 414 U.S. 86, 95 (1973) (differentiating between "national origin" and "citizenship status" and holding that "[a]liens are protected from illegal discrimination under [Title VII], but nothing in [Title VII] makes it illegal to discriminate on the basis of citizenship or alienage"), but Plaintiffs' theory of discrimination is not supported by the evidence. For these reasons, Defendants are entitled to summary judgment on Count V.

### 6.    MPWA—Unlawful acts relating to payment of wages

Finally, in Count VI, Plaintiffs allege that Defendants violated three provisions of the Minnesota Payment of Wages Act: Section 181.032 by "fail[ing] to state the total numbers of hours actually worked by Plaintiffs . . . on their earnings statements," Section 181.03 by taking the tips left for Plaintiffs, and Section 181.101 by failing to pay Plaintiffs "'all wages

earned'" at least once every 31 days. (First Am. Compl. ¶ 103.) Defendants argue that these claims fail because they are both legally and factually deficient. (Defs.' SJ Mem. at 24.) The Court agrees with respect to the claims asserted under §§ 181.032 and 181.03, but not with respect to the claim asserted under § 181.101.

### a.      Section 181.032

Under Minnesota Statutes § 181.032, an employer must provide each employee with an earnings statement at the end of each pay period. Minn. Stat. § 181.032(a). The earnings statement may be in any form, but it must include:

(1)      the name of the employee;
(2)      the hourly rate of pay (if applicable);
(3)      the total number of hours worked by the employee unless exempt from chapter 177;
(4)      the total amount of gross pay earned by the employee during that period;
(5)      a list of deductions made from the employee's pay;
(6)      the net amount of pay after all deductions are made;
(7)      the date on which the pay period ends; and
(8)      the legal name of the employer and the operating name of the employer if different from the legal name.

Id. § 181.032(b) (emphasis added). Because violators of this statute may be subject to civil penalties, see Schroeder v. Kubes, No. A12-0357, 2013 WL 1285476, at *4 (Minn. Ct. App. Apr. 1, 2013), the statute must be strictly construed, see Brekke, 683 N.W.2d at 774.

The only violation of this statutory provision that Plaintiffs allege is a failure to include on the earnings statement the total number of hours that Plaintiffs "actually worked." (First Am. Compl. ¶ 103.) In other words, Plaintiffs contend that Defendants violated the statute by providing inaccurate earnings statements that did not include the hours that Plaintiffs allegedly worked off the clock. (Pls.' SJ Opp. at 19–20.) For their part,

Defendants argue that Plaintiffs should not be allowed to "bootstrap" this recordkeeping claim onto their substantive claim where Plaintiffs failed to report the work to Defendants. (Defs.' SJ Mem. at 29.)  Defendants also argue that Plaintiffs' construction of the statute would violate the purpose of the statute, which is to inform employees how their pay is calculated so that they can determine if a mistake has been made, and would unduly burden employers.  (Id. at 28.)

The Court agrees with Defendants that it would be unreasonable to hold an employer liable for civil penalties every time it made a mistake on an earnings statement because, at least with the provision at issue in this case, the mistake could be wholly within the employee's control—e.g., the employee forgets to punch in for work.  While there appear to be no cases directly addressing this issue, judges within this District have addressed a similar issue under a recordkeeping provision of the MFLSA.  In LePage v. Blue Cross & Blue Shield of Minnesota, the plaintiff-employees alleged that the defendant violated the MFLSA's requirement to keep a record of "'the hours worked each day and each workweek by the employee'" by "fail[ing] to maintain records for certain time before and after their scheduled shift" even though the plaintiffs had not reported the time on their time cards. Civ. No. 08-584 (RHK/JSM), 2008 WL 2570815, at *4–5 (D. Minn. June 25, 2008) (quoting Minn. Stat. § 177.30).  The court dismissed the plaintiffs' claim, finding that they were trying to "bootstrap" a recordkeeping claim onto their substantive claim that they were not paid overtime.  Id. at *5; see also Le v. Regency Corp., 957 F. Supp. 2d 1079, 1090–91 (D. Minn. 2013) (adopting the analysis from LePage where the plaintiffs sought to maintain a recordkeeping claim under the MFLSA based on their alleged off-the-clock work).

Similarly, here, Plaintiffs are attempting to bootstrap a recordkeeping claim onto their substantive claim that they were not paid for the time they allegedly were required to work off the clock.  Accordingly, Defendants are entitled to summary judgment on Plaintiffs' claim under Minnesota Statutes § 181.032.

### b.      Section 181.03

Under Minnesota Statutes § 181.03, "[a]n employer may not, directly or indirectly and with intent to defraud: . . . directly or indirectly demand or receive from any employee any rebate or refund from the wages owed the employee under contract of employment with the employer."  Minn. Stat. § 181.03, Subd. 1(2).  Because this statute provides for a civil penalty, the statute must be strictly construed.  Karlen v. Jones Lang LaSalle Americas, Inc., 766 F.3d 863, 867 (8th Cir. 2014).

Defendants argue that Plaintiffs cannot demonstrate that Defendants took a "rebate" or "refund" from wages that were owed to Plaintiffs under a contract of employment, or that Defendants acted with the intent to defraud.  (Defs.' SJ Mem. at 25.) According to Defendants, the terms "rebate" and "refund" require that funds first be given to an employee, and, here, the alleged off-the-clock time was by definition not paid to Plaintiffs, and the tips were not owed to Plaintiffs under any contract of employment. (See id. at 25–26.)  Plaintiffs, on the other hand, simply assert that Defendants' arguments "strain[] credulity," but they cite to no authority to support their contention that "[i]f TMI stole tips left for housekeepers by guests by collecting them prior to room cleaning by housekeepers, then it certainly indirectly received rebates or refunds from housekeepers' wages."  (Pls.' SJ Opp. at 19.)

The Court agrees with Defendants. "Basic canons of statutory construction instruct that [the Court is] to construe words and phrases according to their plain and ordinary meaning." Am. Family Ins. Grp. v. Schroedl, 616 N.W.2d 273, 277 (Minn. 2000). Here, the ordinary meaning of the terms "rebate" and "refund" is "a return of a part of a payment," "to give or put back," or "to return (money) in restitution, repayment, or balancing of accounts." Merriam-Webster's Collegiate Dictionary 974, 983 (10th ed. 1999). The term has also been interpreted to mean a "reimbursement." See Weme v. Freeway Ford, Inc., No. EM 02-009737, 2003 WL 23741867, at *4 (Minn. Dist. Ct. Apr. 11, 2003) ("[The defendant's] policy in forcing its salespersons to reimburse it for the $25 dealer share if they wanted to receive an incentive through the Spin Program could reasonably be seen as a demand that the salespeople forfeit a portion of their incentive as a refund or rebate to [the defendant] in violation of Minn. Stat. § 181.03 Subd. 1(2).").

Both the First Amended Complaint and Plaintiffs' briefing on this claim are limited to the allegations of tip-stealing, and Plaintiffs have put forth no evidence to create a genuine issue for trial that tips were owed to Plaintiffs under a contract of employment or that Defendants paid—and then received as a return on that payment—those tips. Accordingly, Defendants are entitled to judgment as a matter of law on Plaintiffs' claim under Minnesota Statutes § 181.03.

### c.    Section 181.101

Finally, under Minnesota Statutes § 181.101, "every employer must pay all wages earned by an employee at least once every 31 days on a regular payday." Minn. Stat. § 181.101(a). This statutory provision governs the timing of payment, not the substantive

46

right to the payment itself.  See Milner v. Farmers Ins. Exchange, 748 N.W.2d 608, 617

(Minn. 2008) ("While the MFLSA addresses minimum wage and hour standards, the PWA

addresses how often wages must be paid and establishes penalties for wages that are paid

late."); Erdman v. Life Time Fitness, Inc., 771 N.W.2d 58, 64 (Minn. Ct. App. 2009) (citing

Minn. Stat. § 181.101 and stating that "[t]he timing of payment is governed . . . by the

PWA").  Again, because violators of this provision may be subject to civil penalties, see

Minn. Stat. § 181.171, Subd. 1, the statute must be strictly construed, see Brekke, 683

N.W.2d at 774.

Defendants argue that Plaintiffs' claim under § 181.101 is like their other

recordkeeping claims and similarly cannot be bootstrapped onto substantive claims for

payment for off-the-clock work.  (Defs.' SJ Mem. at 30.)  More specifically, Defendants

rely on Cosgrove v. Regents of the University of Minnesota, No. A12-1288, 2013 WL

776967 (Minn. Ct. App. Mar. 4, 2013), for the proposition that § 181.101 is a timing statute

under which claims are permissible only when the wages owed are "undisputed."  (Id. at

30–31.)

In opposition, Plaintiffs argue that § 181.101's "all wages earned" language should

be interpreted in light of the Minnesota Legislature's 2013 amendment to § 181.13, another

MPWA timing provision.  (Pls.' SJ Opp. at 20.)  Section 181.13 provides that "the wages or

commissions actually earned and unpaid at the time of [an employee's] discharge are

immediately due and payable upon demand of the employee."  Minn. Stat. § 181.13(a).  In

2013, the Minnesota Legislature added the following language:  "Wages are actually earned

and unpaid if the employee was not paid for all time worked at the employee's regular rate

of pay or at the rate required by law . . . ." Id. (emphasis added).  Thus, according to

Plaintiffs, a violation of § 181.101 occurred if Plaintiffs were not paid for their off-the-clock

work in a timely manner.  (See Pls.' SJ Opp. at 20–21.)

The Court agrees that § 181.101 is a timing statute.  As such, it "does not create a

substantive right to the recovery of a particular wage." Caldas v. Affordable Granite &

Stone, Inc., 820 N.W.2d 826, 837 (Minn. 2012) (interpreting Minnesota Statutes § 181.13).

Rather, an employee "must establish an independent, substantive legal right, separate and

distinct from [the timing provision] to the particular wage claimed." Id.  However, if the

employee establishes this right, then the employee also may maintain a cause of action for a

violation of the timing statute.  See Karlen, 766 F.3d at 868 (stating that the employer was

subject to penalties for a failure to pay if it owed the employee an unpaid commission).

Contrary to Defendants' contentions, Cosgrove supports this conclusion.  In that

case, an employee who challenged his employer's failure to pay him a termination fee

pursuant to his employment contract filed a complaint in state court alleging only that his

employer had violated § 181.13. Cosgrove, 2013 WL 776967, at *2.  The Minnesota Court

of Appeals concluded that "the heart of [the plaintiff's] argument is that he is entitled to

payment of a termination fee under the terms of [his employment contract]," and that such a

dispute "does not fall under section 181.13, which is a timing statute." Id. at *4.  Rather, the

court held, "the allegation that [the plaintiff] has a right to wages that remain unpaid would

need to be undisputed before [he] could maintain a section 181.13 claim for untimely

payment of those wages." Id. (emphasis added).  In other words, the plaintiff could not

maintain his claim under the timing statute because he had not first established that he had an independent, substantive legal right to the wages at issue.

Although Defendants rely heavily on the Cosgrove court's use of the term "undisputed" for the proposition that claims under § 181.101 are permissible only when the wages owed are not in dispute, this Court finds that use of that term is limited to the facts in Cosgrove:  when the plaintiff filed his lawsuit under § 181.13, he bypassed a required administrative process in which his right to payment of the disputed wages would have been determined—i.e., would have been rendered "undisputed." See Cosgrove, 2013 WL 776967, at *2.  The Minnesota Supreme Court's and the Eighth Circuit's analyses of § 181.13 claims support this limitation.  For example, in Caldas v. Affordable Granite & Stone, Inc., the plaintiffs claimed that they had earned a certain amount of wages pursuant to an employment contract prior to their termination, but that the entire amount of wages had not been paid as required under § 181.13.  820 N.W.2d at 836.  The employer disputed that the plaintiffs were entitled to the claimed amount.  See id. at 832–35.  After determining that the plaintiffs were not owed the claimed amount under the alleged contract, the Minnesota Supreme Court concluded that "[the plaintiffs] have failed to establish a separate substantive legal right to recover wages that is separate and distinct from section 181.13, and therefore [the plaintiffs'] statutory claim fails."  Id. at 837 (emphasis added).  Similarly, in Karlen v. Jones Lang LaSalle Americas, Inc., the Eighth Circuit stated that, "[u]nder the terms of [§ 181.13], . . . [the employer] is only subject to penalties for failure to pay . . . if it owed [the employee] a commission . . . at the time of his termination."  766 F.3d at 868 (citing Minn. Stat. § 181.13).  The court noted that whether

the employee had earned a commission was dictated by his employment contract. <u>Id.</u>  The court then proceeded to analyze that contract and concluded that no commission had been "earned" prior to the employee's termination.  <u>Id.</u>  Accordingly, the employer did not owe the employee any payment at the time of his termination and so there had been no violation of § 181.13.  <u>Id.</u> at 869.  Thus, to the extent that claimed wages must be "undisputed" before a plaintiff may maintain a claim under a timing statute, the rule is simply that a plaintiff must first establish that he has an independent, substantive legal right to those wages.  If so, the plaintiff may also pursue a claim under a timing statute.

In this case, although Plaintiffs cannot pursue their substantive claim for off-the-clock wages through § 181.101, they can maintain alongside their substantive claim a parallel claim for the untimely payment of those wages.  In other words, should it be determined that Plaintiffs were entitled under, for example, an employment agreement, to payment for their alleged off-the-clock work, then Plaintiffs also will be entitled to pursue a statutory penalty to the extent that those payments did not comply with the timing requirements in § 181.101.  Therefore, because there is an issue of fact regarding whether Plaintiffs are owed unpaid wages for off-the-clock work, there is also an issue of fact as to whether Plaintiffs were paid all wages earned in a timely manner.  For these reasons, Defendants' Motion is denied in this regard, and Plaintiffs may proceed on Count VI to the extent that it is based on their claim under Minnesota Statutes § 181.101.

### 7.    Conclusion

In conclusion, Defendants are entitled to summary judgment as to Opt-in Plaintiff Collins's overtime claim in Count I (FLSA); the minimum wage-, recordkeeping-, and

tips-related portions of Count II (MFLSA) and the meal-break claims in Count II that are

based on shifts of less than eight hours; the entirety of Count III (Minnesota Statutes

§ 181.79); the non-doughnut hole hour-based breach of contract claim in Count IV; the

entirety of Count V (MHRA); and the earnings statement- and unlawful refund-related

allegations in Count VI (MPWA).  Plaintiffs may proceed to trial on their minimum wage

and overtime claims in Count I (except for the overtime claims of Opt-in Plaintiff

Collins), the rest break-related portion of Count II and the meal-break claims in Count II

that are based on shifts of eight or more hours, the doughnut hole hour-based breach of

contract claim and the conversion claim in Count IV, and the timing of payment-related

allegations in Count VI.

## IV.    ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS**

**HEREBY ORDERED THAT:**

1.    Defendants' Objections to the Magistrate Judge's May 13, 2015 Order [Doc.
No. 69] are **OVERRULED IN PART AND OVERRULED AS MOOT IN
PART**; and

2.    Defendants' Motion for Summary Judgment [Doc. No. 87] is **GRANTED IN
PART AND DENIED IN PART**, as detailed herein.

3.    A separate Pretrial Order will follow, setting this matter for trial on
Monday, December 14, 2015.

Dated:  October 14, 2015              s/Susan Richard Nelson
                                      SUSAN RICHARD NELSON
                                      United States District Judge